**Pages 1 - 26**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Judge

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) **NO. 3:26-cr-00146-TLT-1**
)
ELIJAH ARMSTRONG, )
)
Defendant. )
)

San Francisco, California
Monday, May 18th, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For the Plaintiff:
U.S. ATTORNEY'S OFFICE
NORTHERN DISTRICT OF CALIFORNIA
450 Golden Gate Avenue, 11th Fl
San Francisco, CA 94102
**BY: KELSEY CHRISTINE DAVIDSON, ATTORNEY AT LAW**
**JARED BUSZIN, ATTORNEY AT LAW**

For the Defendant:
FARMER BROWNSTEIN JAEGER SIEGEL & SHEPARD, LLP
155 Montgomery St, Ste 1301
San Francisco, CA 94104
**BY: MICHAEL H. SHEPARD, ATTORNEY AT LAW**

REPORTED REMOTELY BY: Andrea Bluedorn, RMR, CRR, CRC
Official United States Reporter

**May 18th, 2026** **12:09 p.m.**

**P R O C E E D I N G S**

---o0o---

**COURTROOM DEPUTY:** The courtroom has been unsealed and we are now calling criminal matter 26-146-TLT-1, United States vs. Elijah Armstrong.

Counsel, starting with the Government, please state your appearances.

**MS. DAVIDSON:** Good morning again, Your Honor.

Kelsey Davidson and Jared Buszin for the United States.

**THE COURT:** Good afternoon.

**MR. SHEPARD:** And good afternoon, Your Honor.

Mike Shepard for the defendant Elijah Armstrong who is present in court and in custody. He also has his father and his grandfather in the courtroom.

**THE COURT:** Good afternoon.

**PRETRIAL OFFICER:** Allyse Johnson with U.S. Pretrial.

Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

We are here on the Government's detention motion.

Counsel, please proceed.

**MS. DAVIDSON:** Yes, Your Honor.

Before I do, I do have one victim who is present in court who would like to speak and I would like to know if Your

Honor would like to hear that before or after I proceed with my proffer.

**THE COURT:** I don't have a preference as to the order but if the victim would like to come forward now, that would be fine.

**MS. DAVIDSON:** Okay. We can call him now.

**THE COURT:** Please come up to the microphone where the AUSA is and then please state your name and make your statement to the Court.

**VICTIM:** Thank you for hearing me, Your Honor. My name is XXXXXXXXXXXXX.

My family and I now live in fear. Personal data leaks have put us in a situation where we're forever at risk of the most nightmarish violence even in our own home. Even though we no longer have direct access to crypto assets, we don't see an end to the threat because the data on the internet doesn't go away.

Our best hope for justice now comes down on the -- our best hope is justice comes down hard on the perpetrators of these crimes and dissuades future potential criminals.

This is not a typical robbery case. The defendant -- the defendants are intelligent and capable, yet used their gifts to commit unconscionable acts. Using sophisticated high-tech methods and intricate long-term plan to hunt us down, they entered our home with lethal force and put me in the

hospital. They were prepared to torture and mutilate us to get what they wanted.

The crimes center around a new type of asset that can't be easily detected, confiscated, or controlled. The assets exist beyond the borders of countries and outside of traditional financial controls. And these assets, well understood by the defendants, can be easily harnessed to help him escape and capture if he's not detained.

No set of conditions can reasonably ensure the safety of the community or guarantee his appearance. Detention is the only appropriate outcome.

Thank you.

**THE COURT:** Thank you for your statement, sir. I appreciate it.

And now the Government, please proceed with your argument.

**MS. DAVIDSON:** Yes, Your Honor. Before I do, I also have two statements from two victims who could not be here today. They asked me to read those out loud in court.

**THE COURT:** Go ahead.

**MS. DAVIDSON:** I have copies if Your Honor would like them as well for you.

**THE COURT:** If you could pass one to both the defense attorney and me, that would be fine.

**MS. DAVIDSON:** The first one is from victim number 4

in the indictment. He stated, I appreciate the efforts of the U.S. Attorney's Office to bring this case to my attention. He is the person who invaded my home with a gun, zip tied my hands and feet, duct taped me to a chair, pistol whipped me several times, and threatened me with grave bodily harm for 30 to 40 minutes.

A danger to the community? Is he a flight risk? Let me be clear, yes and yes. This person is a danger to every community they are a part of. This person is attempting to steal assets that are inherently stateless and outside of any government's control. I cannot imagine how any court could consider this person anything other than the violent, dangerous flight risk they obviously are.

I have one additional statement from victim number 1 in the indictment.

**THE COURT:** Please submit to the defense and then hand it up to me.

**MS. DAVIDSON:** Victim number 1 wrote, Your Honor, I am a victim in this case and I respectfully ask that the defendants be detained pending trial. On November 22nd, 2025, I was physically beaten and assaulted in a premeditated attack at my home in San Francisco.

During the attack, my hand and feet were bound and I was left completely helpless. While pointing a gun directly at my face, one of the defendants told me I'm with the Mexican

Cartel. I recently killed a man and my daughter has cancer. I have nothing to lose and I will kill you.

In that moment, I truly believed I might die and I was thinking of my family. Later, when I entered the password to one of my crypto accounts incorrectly twice, a voice on the phone said cut his finger off. The defendant agreed and went to the kitchen to get a knife.

Near the end of the attack, the defendant said to the voices on the phone I'm going to set the house on fire before pouring liquid on me. This was not random and it was not impulsive. It was deliberate, targeted, and extraordinarily violent. It also appeared to be coordinated with other people over the phone.

It happened in broad daylight at my home on a residential street. That only deepens my fear that these defendants do not meaningfully fear consequences. Their knowledge of me and my crypto holdings also suggested prior information and planning which makes what happened even more frightening to me.

What happened has had a profound effect on me. I no longer feel safe in public and I no longer feel safe opening the door to my own home. The idea that the people who did this could be released makes it hard to imagine living a normal life without fear. I continue to live with the trauma of what happened and I do not feel safe with them being released.

In my view, they are an extreme danger to the community. I also believe they are a flight risk given the seriousness of the charges and the consequences they face. For those reasons, I respectfully ask they be detained pending trial.

So I don't want to repeat everything in our detention memo, but I do want to highlight a few key points. First, in regards to danger, the defendant is involved in a violent conspiracy to commit armed robberies and kidnappings in order to steal cryptocurrency from people. This conspiracy includes four separate incidents.

In San Francisco, this involved a coconspirator repeatedly assaulting the victim with a -- including with a firearm, threatening to kill him, tying him up, demanding access to his crypto accounts, and stealing approximately $6.5 million before they left him tied up. They then poured a liquid on him and threatened to set him on fire. Mr. Armstrong's DNA was found on the duct tape that was used to bind this victim.

In San Jose, Mr. Armstrong hit the victim over the head with a firearm and attempted to force him inside his garage. The victim was only saved by a passing Amazon truck. He was also involved in surveilling the house beforehand. He pretended to be with a power washing company in order to approach the victim's house. An account tied to Armstrong

requested an Uber after this power washing incident, placing him there.

His phone was also in the vicinity during a failed pizza delivery attempt, the power washing incident, and the attempted robbery and kidnapping. In Sunnyvale, the coconspirators first attempted to contact the victim at his LA residence. One of the co-defendants, Mr. Chindavanh, placed a DoorDash order for zip ties, duct tape, face masks and gloves which showed their intent to tie up and insist upon -- and force an answer about cryptocurrency.

The Sunnyvale victim was not at his house in LA. He was at his house in Sunnyvale so the coconspirators targeted that address. When they made repeated delivery attempts to the door, Mr. Chindavanh approached the door, brandished a firearm, and tried to push his way inside. During that time, Mr. Armstrong was in the background surveillance footage.

After Mr. -- after Mr. Chindavanh could not force his way in, they fled. Mr. Chindavanh fled in a car. He was later found in that car, and Mr. Armstrong's fingerprints were found in that car.

After Mr. Chindavanh's arrest, this did not deter Mr. Armstrong. He continued to carry out this violent conspiracy. He and Mr. Rucker went to Los Angeles where Mr. Armstrong approached the door of victim number 4's house.

He pretended to be a delivery person and said he

wanted a glass of water. He used that to follow the victim inside where he then hit the victim over the head with a firearm, tied him up. During that time, Mr. Rucker entered and the two of them continued to assault and threaten the victim. They ultimately duct taped him to an office chair where they called another coconspirator on the phone and tried to access his cryptocurrency.

During this time, the victim's wife was able to call 911 and Mr. Armstrong and Mr. Rucker fled upon hearing helicopters overhead. When they fled, Mr. Armstrong was driving a car, he crashed that car, and was arrested.

The LA victim identified him after that, and a gun -- a loaded gun and victim 4's possessions were found in that car with Mr. Armstrong.

The weight of the evidence clearly supports detention here. There is DNA evidence, cell phone data, surveillance footage, he was arrested fleeing the scene of the LA crime. He had the victim's possessions in his car, the victim identified him. And his history also supports he is a danger to the community.

He has a prior conviction in Tennessee. He was on bail for possession of a defaced firearm in Arkansas at the time of the later three incidents and he was then arrested with a firearm in the car in LA only a few weeks later. And while his criminal history is relatively small, all occurred in a

span of 1.5 years which emphasizes that he is clearly prone to committing danger at this time in his life.

And all of this shows the defendant is a significant danger to the community. He is also a flight risk. He's from Tennessee. Has no ties to the Bay Area.

He has the resources to flee -- excuse me. Given that the conspiracy was successful in stealing almost $7 million from the first victim. He also has a prior failure to appear charge from Tennessee and he has pending charges in Arkansas.

So we agree with both pretrial in the Central District and the Northern District of California that there are no conditions that would reasonably ensure the safety of the community or his appearance at future court dates.

**THE COURT:** Thank you, counsel.

Let me hear from the defense.

**MR. SHEPARD:** Thank you, Your Honor.

While most of what the prosecution has said is not a surprise to me given the discovery they produced, I did not receive their detention memo and there are a few things in there that are new to me.

**THE COURT:** Oh, it was filed on the docket.

**MR. SHEPARD:** Okay.

**THE COURT:** It was. Correct?

**MS. DAVIDSON:** Correct.

**THE COURT:** Okay. But go ahead.

**MR. SHEPARD:** So I'm not here to argue that these offenses are not serious and dangerous. I am, however, here to argue what determination the Court needs to make is not whether the crime's dangerous but whether there is any condition or combination of conditions that might reasonably assure the safety of the community and the appearance of the defendant. And I think if we roll up our sleeves and work through that, the answer is there are conditions that would reasonably assure both the safety of the community and the appearance of the defendant.

So let me try to take these sort of one by one.

In terms of flight risk, I gathered that the Government is saying there's a risk for flight here because there was a lot of money that was obtained. And that may be true. I don't know. I accept the Government's proffer about that for these purposes, but there is no indication that my client received any of that or any substantial amount of money.

In fact, what the Government did not mention (inaudible) it's quite clear from several of the victims in terms of what they were saying happened that the people who were in their home were getting directions from somebody else who was masking the -- the somebody else who was giving the directions was masking his or her appearance and voice. So there was someone sophisticated behind the perpetrators of the offense. I think the only reasonable assumption, given that my

client is indigent, is that the perpetrators of this offense who made off with the money, those people might be a risk of flight but Mr. Armstrong is not.

And the victims who say I consider him a risk of flight, they know nothing -- I understand why they would feel that way. I don't mean to denigrate them in any way but they know nothing about Mr. Armstrong or his connections to his family and all of the other things that the Court would consider and should consider in determining whether he is an appropriate risk for bond.

The -- the Government said a number of things about a criminal record and I want to address that also because I think that might be front of mind to the Court. Here is my understanding, for a -- almost the entirety of Mr. Armstrong's life, he had no criminal issues of any kind other than use of marijuana. There was I think in the presentence report or pretrial services report, one episode that showed up as a failure to appear, I think, on one of those marijuana issues, and what Mr. Armstrong explained to pretrial services was that there was confusion about the Court date.

He's the one who raised it, called, they said you missed your court date. He then turned himself in and he was processed and the whole matter was dropped at the time. So that's the only sort of failure to appear that I know of. There is no criminal wrongdoing other than --

**THE COURT:** The bail report from the Central District of California states that the defendant has a recent arrest for bond jumping.

**MR. SHEPARD:** That is the one I'm talking about. That's the only one I'm familiar with.

**THE COURT:** Oh, so that's the thing you were just describing?

**MR. SHEPARD:** Yes. That's the only one I'm aware of.

**THE COURT:** Thank you.

**MR. SHEPARD:** The prosecutor correctly notes there is a charge against him in Arkansas, that's in the same very limited period of time he was, from as best I can tell, other than marijuana, until November of last year, until the second half of November of last year, he was a valued number of his family, he has a fiance, he worked a pretty regular job at General Motors building cars sort of an on and off job because they don't have the demand to continue to build cars but he was a good member of the community for quite a long time.

According to the Government's allegations, there is a very limited window of time, about a five plus week period where they say he was not and I want to talk a little bit more about that. But we're talking about a very limited period of time as -- about someone who the rest of his existence, other than the marijuana, has been what you would like to see in any young man growing up in a community.

To talk about -- and I -- it seems clear from the -- what the prosecution said, and although I don't necessarily have all of the information they have at this point although they have given me some, but what I do know about the three Bay Area incidents is, as best I can tell, no one is going to identify him as having participated in any of the three of those incidents. He --

**THE COURT:** You mean the victims won't.

**MR. SHEPARD:** Yes, the victims.

**THE COURT:** Presumably law enforcement, when they caught him --

**MR. SHEPARD:** That's the Los Angeles one. I'm now speaking of the --

**THE COURT:** Oh, I see. Thank you.

**MR. SHEPARD:** The San Francisco incident, that's the one I mentioned earlier, the victim said he did not get a good look at the suspect or the subject and the subject was possibly Black and he gave a height range that is significantly shorter than Mr. Armstrong.

The Government said they found his DNA on the duct tape. That is, as best I can tell from talking to a number of DNA experts over the weekend, a significant -- significant is a polite word -- overstatement. The -- the experts that I consulted who reviewed the San Francisco Police Department's DNA report called it a very, very weak association that runs a

high risk of false positives. The report itself says only that the DNA gives limited support to including Mr. Armstrong as a possible person who touched the DNA. And limited support is a term of art in this report that refers to a likelihood ratio between one and 100.

The likelihood ratio that was computed in the report was 29.3, so we're talking about the lower third of limited support. And there are many laboratories around the country, obviously San Francisco is not one of them, but there are many laboratories around the country that do not report anything if the likelihood ratio is up to 1,000. We're talking about 29.3 here. There are many labs, many good labs that do not report anything up to 1,000, and that's because of the risk of false positives when the numbers are so low.

Most of the numbers that connect someone through DNA are like septillions and, you know, these huge massive numbers. We're talking about these miniscule numbers that many labs would reject right off the bat. We don't -- I should add we don't have all of the data. There was DNA profile and other things that he reviewed to actually understand this better.

One of the other interesting things about this DNA report, is that there was twice as much DNA on an item, the duct tape, of someone unknown than the amount of DNA for which there is this very limited support that it might be Mr. Armstrong. So it seems to me that they're missing the actual

suspect. There's a lot more of that other person's, the third person, or victim has -- I assume is the victim. It's masked in the report but there's a lot of the victim's DNA on it.

The second most victim is someone who is completely -- second most person whose DNA is on it is unknown and there's a very small amount, I think five percent of the DNA, is attached to the person for which there is some limited support, according to the San Francisco Police, that it could be Mr. Armstrong but most -- many labs around the country would say too high of risk of false positive and we won't even report that.

And, separately, a number of very reputable laboratories would say that because there's only five percent of the DNA that's attributable to the person the Government wants to say is Mr. Armstrong, most -- and I think even some Federal agencies won't report on less than a 20 percent contributor in a three person mix, and you have a three person mix here. The person the Government says is Mr. Armstrong is only five percent of the DNA. Many labs would not even consider a five percent person. You wouldn't report that either.

So that seemed to be the strongest piece of evidence that connects Mr. Armstrong to actually being in the house as part of one of these three Bay Area incidents and there's -- it's really -- shouldn't really be in.

And I don't think the San Jose or Sunnyvale stuff is much better. In Sunnyvale, the main perpetrator is, according to the Government, this separately charged Mr. Chindavanh. The witnesses said that the other people who might have been involved, and there's no indication that others were involved and just people on the street, and they were described as having a light complexion while wearing a mask.

And as I mentioned earlier, I think the main perpetrator in San Jose who is described as a 30 year old Black guy which is quite a miss on Mr. Armstrong's age. So, I mean, this is not a sense of -- and I'm sorry. There's one other with these episodes. That's the one in Arkansas where I believe the Government says he was driving a car that had a gun in the back. It's not his car so I -- I don't know how they're really going to make much of that. And they will -- it will be an interesting motion to suppress if Arkansas does pursue this case and does -- as I read the report, the arresting officer said he was sitting in the median strip of the highway watching the cars go by and what appears to have happened is that he sees a car go by in the left lane with two young Black men and he pulls them over for driving too long in the left lane and then there's a subsequent search in which a gun is found in back and not Mr. Armstrong's car.

Even then, that's all within this very short window -- same short window of time. And so I would ask the Court to

focus on not the dangerousness of the offense, of course that's an important consideration, but is not really what a bond determination is based on. A bond determination is based on whether there are conditions that could assure the safety of the community and I submit that there are.

His father and grandfather are here both to speak to the Court as needed and also to underscore of the nature of the close family ties he has, not only to them but also to his granddaughter, which is where he resided before he was arrested. He also has a fiance. He's got a very close and supportive community in Tennessee.

His grandmother, I believe, has expressed bringing this to pretrial services to post her home as collateral, as security for -- for Mr. Armstrong. His father and his grandfather who are here are prepared to be custodians to serve in whatever capacity the Court might want. And I believe that under those circumstances and given the limited period of time, according to the Government's evidence if taken at face value, he -- if the Government is right about that, there was a five or six week period and I ask the Court view his life as a whole and the support he has from his family and his family's willingness to put up or shut up about it by posting what I expect is the most valued asset, a security.

And so what I would propose to the Court is that he be released to the custody of his father and his grandfather, that

the Court accept a security maybe his mother's -- his grandmother's home, that the Court put ankle monitors or whatever else the Court would want on -- on as the -- some additional comfort and let him resume the good life that he had.

And I -- I underscore the importance of that both because I know the Court is aware of the same data that I'm aware of which is that it's a very, very small percentage of people in this district who are placed on bond and who even reoffend willfully. And not only that, having been around the block a few times, it makes a huge difference in terms of how a case ultimately is resolved if the defendant is convicted that the defendant has had an opportunity to rebuild his life, go back to the things that the defendant was doing to cement family ties with his fiance who is pregnant, to resume gainful and productive employment, all of those kinds of things make a huge difference when it comes time for a defendant to be sentenced.

And that's not just it's better for him, it's better for everybody because then the chances that he will remain as a constructive member of society are so much higher. And that's why I think that while the crimes that were described are dangerous, the Court should recognize that there are conditions and combinations of conditions that would reasonably assure the safety of the community and the appearance of the defendant,

and I ask the Court to release him on the terms that I have suggested.

**THE COURT:** Thank you, counsel.

Would the Government like to respond?

**MS. DAVIDSON:** Yes, Your Honor, just briefly.

I think there are a couple of things, first, in terms of dangerousness, I don't think it's relevant that no victims of the Bay Area can identify him. First of all, the one in LA can. That was the one where Mr. Armstrong hit him over the head with a firearm, tied him up, and assaulted him for 30 to 40 minutes.

And, second, even though there are many times where victims themselves can't identify defendants, that doesn't mean that law enforcement doesn't know who they are. And as we laid out in our detention memo, Mr. Armstrong wore the same distinctive white sunglasses at multiple different incidents throughout the Bay Area which ties him to that.

I also think that in terms of the DNA, yes, there's limited support, but the Government is not at this time saying Mr. Armstrong was the one who attacked victim one. We are merely stating that this shows he was involved in this conspiracy from the beginning.

And in terms of Arkansas, whether there is a motion to suppress is irrelevant at this time. What is important is that he was pulled over with a gun in a car and said he had just

come from California, and this was days after the San Francisco incident.

In terms of evidence, for the Sunnyvale incident, there is additional evidence that the defense ignored, including that his cell phone data places him there, he's in the background of surveillance footage, and he text messaged Mr. Chindavanh prior to Mr. Chindavanh's approach saying do you want the gun or do you want to do tape and zip ties? Mr. Chindavanh said he would take the tape.

When he approached the residence and fumbled the first time he approached, Mr. Armstrong then told him he needed to bring the gun. Mr. Chindavanh approached the second time with the gun that time. So there very clearly is evidence that he is a danger and is encouraging the use of firearms and has firearms, used firearms.

In terms of whether he's a flight risk, the defense claims there's no indication he received any money for the San Francisco one. That doesn't mean he didn't get paid or people in the conspiracy wouldn't help him escape. He -- when he was transferred up here, his property was transferred up here, and the FBI obtained a search warrant for some envelopes that he had in his possession.

These included rap lyrics that said that he had fired his public defender and was hiring a paid lawyer. So whether or not he has -- I didn't confirm that on the docket, Your

Honor, but I do know that he says he has money to at least pay a lawyer. And he has many ties to Tennessee but none to here. And even some of his ties are not that credible.

The pretrial report admits his fiance claims she is not pregnant and not expecting a child. And I don't really know how any of the conditions that the defense opposed -- or proposed would ensure the safety of the community or even his appearance here in the Northern District.

**THE COURT:** Would the defense like to respond further?

**MR. SHEPARD:** If I could have one moment.

**THE COURT:** Yes.

**MR. SHEPARD:** So it's -- it's hard to be completely responsive to a bunch of things but the notion that somebody is identified based on sunglasses, seem like somewhat stylish sunglasses, the only thing that the Government has produced to me are photographs, a notion that it's the same sunglasses -- I don't know how you could tell that from the photograph. I mean, even if you could, the notion that people don't have the same -- different people don't have the same stylish sunglasses -- and I think that is a good indication of the quality of the evidence that the Government has at this point about these three Bay Area incidents.

I could tell you that I don't think there are text messages. I could tell you that I think I can prove my client was in different places at the time the Government places him

in these offenses. But I think if I were in the Court's position, I probably wouldn't want to be that much in the weeds about the evidence. The point I want to make to the Court is that these three Bay Area ones, the evidence is pretty weak in terms of his involvement.

And -- and I think the Government's efforts to dress up the three in order to make it seem more like he should be detained, I don't think the Court should accept that. Proof is pretty bad. I don't mean to discount the victim but the victim doesn't have anything that the victim could say that would suggest Mr. Armstrong is involved, and I think that's going to be true of -- of the Bay Area episodes. So if you take the Government's proof that has -- as they articulated it now, I go back to there's a small window just accepting for argument purposes the Government's proof, it's a very small window in which criminal activity occurred and I ask the Court to consider that in light of the larger picture of the life that he led before then and the family support that he would be relying on and would be relying on in the event he were released.

And if the Court doesn't think that those conditions are sufficient, perhaps there's a halfway house or something else where he could continue to contribute and maintain his family ties and his employment that would put him in a much better position going forward and that would put the community

in a much better position going forward.

**THE COURT:** Thank you, counsel.

I'm ordering the defendant detained as a risk of flight and a danger to the community. The defendant has no ties to the Bay Area, and he is facing significant prison time in the event he is convicted. He has every incentive to flee and no reason to stay here.

Also, the bail report states that the defendant resisted arrest and fled. He was captured only when his rental vehicle collided with a parked car. These facts collectively make clear that the defendant is a risk of flight and that there are no conditions of release that will mitigate that risk.

The evidence is also clear and convincing that the defendant is a danger to the community in a way that no conditions of release can protect against. The defendant is alleged to be part of a conspiracy to rob and kidnap at least four victims. The alleged crimes involve violence and were meticulously plotted out. This demonstrates a high level of intentionality and planning and shares that the defendant is an unmitigable danger to the community.

I ask the Government to prepare a draft detention order for my review.

**MS. DAVIDSON:** Yes, Your Honor.

**THE COURT:** The parties already have a status

conference before Judge Thompson on July 24th. Is that correct?

**MS. DAVIDSON:** That is correct.

**THE COURT:** Is that correct?

**MR. SHEPARD:** Yes, sir.

**THE COURT:** Is there anything further from the Government this morning?

**MS. DAVIDSON:** No, Your Honor. Thank you.

**THE COURT:** Anything further from the defense?

You can talk to your client. Go ahead.

**MR. SHEPARD:** Yeah. I think my client was just asking me if -- and I've spoken to the prosecution about this -- if I could give him a copy of the discovery that I have been given by the Government. I have come up with a unstapled version of it.

**THE COURT:** Is there any problem with the counsel providing his client that discovery?

**MS. DAVIDSON:** No, Your Honor.

**THE COURT:** Okay. Anything -- anything further from the defense?

**MR. SHEPARD:** No, Your Honor.

**THE COURT:** All right. Thank you, counsel.

The defendant is remanded.

The matter is submitted.

**COURTROOM DEPUTY:** Court is adjourned.

(Proceedings adjourned at 12:50 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, June 16th, 2026.

Andrea K Bluedorn

Andrea K. Bluedorn, RMR, CRR
Official United States Reporter